**FILED**
**JUL 17 2013**
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

IN THE MATTER OF THE SEARCH OF
THE CELLULAR TELEPHONE ASSIGNED
CALL NUMBER (314) 363-4536

Case No. 13-mj-3053-DGW

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jeremiah Henning, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (314) 363-4536 (the "**TARGET TELEPHONE**"), whose service provider is Sprint, a wireless telephone service provider headquartered at 6550 Sprint Parkway, Overland Park, Kansas. The subscriber of the **TARGET TELEPHONE** is unknown, but the **TARGET TELEPHONE** is utilized by **Daniel Hernandez**. The **TARGET TELEPHONE** is further described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. The affiant, Jeremiah Henning, is a Special Agent with the Drug Enforcement Administration (DEA) assigned to the Fairview Heights Resident Office. The affiant has been a Special Agent with DEA since May 2012. From October 1998 until January 2012 the affiant was a police officer employed first by the St. Louis (MO) Metropolitan Police Department and subsequently by the Richmond Heights (MO) Police Department. The affiant was also a deputized DEA Task Force Officer from approximately January 2007 until January 2012. During his tenure with DEA, the affiant has participated in numerous investigations involving the manufacture, transportation, and distribution of controlled substances. These investigations

July 2013

have resulted in the seizure of controlled substances and proceeds from the sale of controlled substances, as well as arrests and convictions of drug traffickers. The affiant is familiar with and has utilized normal methods of investigation, including but not limited to physical and electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, analysis of telephone records, the utilization of undercover agents, and the use of court-authorized wire intercepts. The affiant has applied for and been granted numerous Precision Location Information orders similar to this order which have aided in identifying individuals, arresting fugitives, and seizing illegal drugs and drug proceeds.

3. The facts in this affidavit come from the affiant's personal observations, the affiant's training and experience, and information obtained from other agents, witnesses, Confidential Sources (referred to as CS's), and Sources of Information (referred to as SOI's). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of the affiant's knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (the "**TARGET OFFENSES**") have been committed, are being committed, and will be committed by the user of the **TARGET TELEPHONE**, and other known and unknown persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

5. For the reasons set out in this affidavit, there is probable cause to believe that the

**TARGET OFFENSES** have been committed by **Daniel Hernandez, Herbert Garstang, and Zachary Weil**. Further, there is probable cause to believe the user of the **TARGET TELEPHONE, Daniel Hernandez,** is involved in the ongoing commission of the **TARGET OFFENSES.**

## BACKGROUND OF INVESTIGATION

6. Members of the investigative team and I are investigating **Daniel Hernandez** for violations of Title 21, United States Code, Section(s) 841(a)(1) and 846. The investigation has shown that **Daniel Hernandez** uses the **TARGET TELEPHONE**.

7. Your affiant further states that there is probable cause to believe that signaling information, including cell site information, precision location information, and factory installed GPS information will lead to evidence of the aforementioned criminal offenses, the location of **Daniel Hernandez,** and to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

8. On or about July 15, 2013, A DEA source of information (SOI) notified agents of a pending methamphetamine transaction involving **Herbert Garstang** and **Zachary Weil**. According to the SOI, **Garstang** would meet with **Weil** at an unspecified time and location on July 15, 2013 to acquire a multi-ounce quantity of "ice" methamphetamine.

9. On July 15, 2013, the affiant and other members of the DEA investigation team established surveillance of **Garstang** and **Weil**, each being located at separate residences in St. Louis, Missouri. At approximately 5:30pm, agents followed **Weil** from his residence to the parking lot of the Home Depot located at 3202 S. Kingshighway in St. Louis. Agents observed **Weil** park near a Chevrolet Impala whose registered owner was determined to be **Daniel**

**Hernandez**. Agents observed the Hispanic male occupant of the Impala get in **Weil's** vehicle and meet with **Weil**. Agents later reviewed **Daniel Hernandez's** Missouri driver's license photo and confirmed **Hernandez** was the subject with whom **Weil** met.

10. **Hernandez** eventually returned to the Chevrolet Impala and departed. Agents followed **Hernandez** to the interstate, but surveillance was eventually terminated when **Hernandez** unexpectedly crossed multiple lanes of the interstate in order to exit. Agents were unable to follow **Hernandez** discreetly, so surveillance was discontinued.

11. Agents re-established surveillance of **Weil** at his residence after the meeting with **Hernandez** at the Home Depot. Surveillance agents observed Garstang depart from his residence, but surveillance of Garstang was discontinued when agents lost sight of his vehicle in heavy traffic.

12. Agents eventually followed **Weil** from his residence to the Four Seasons hotel in downtown St. Louis. Agents located both **Weil's** and **Garstang's** unoccupied vehicles in the parking garage and established surveillance. Agents later observed **Weil** and **Garstang** enter the parking garage together and approach **Weil's** vehicle. **Weil** retrieved a black bag from the trunk of his vehicle, then **Weil** and **Garstang** re-entered the hotel.

13. Agents maintained surveillance of the parking garage until **Weil** and **Garstang** returned to their vehicles. **Weil** placed the black bag back in the trunk of his vehicle and departed. As agents approached **Garstang** near his vehicle and identified themselves as law enforcement, **Garstang** responded by tossing an object he was carrying. Agents recovered the object and determined it to be a quantity of methamphetamine. **Garstang** later consented to a search of his hotel room which resulted in the seizure of an additional quantity of

methamphetamine. Agents seized a total of approximately 3 ounces of methamphetamine from **Garstang**. (The purported methamphetamine responded positively to field tests but has not yet been analyzed by the DEA laboratory.)

14. **Garstang** told agents he obtained the methamphetamine from **Weil**. **Garstang** also informed agents that **Weil** possessed an additional quantity of methamphetamine in the black bag that agents saw **Weil** place in the trunk of his vehicle.

15. Agents located **Weil's** vehicle in the parking lot of the Casino Queen casino/hotel in East St. Louis, Illinois. Agents contacted **Weil** inside the casino and informed him of the DEA investigation surrounding his distribution of methamphetamine. **Weil** admitted he distributed methamphetamine to **Garstang** earlier in the evening at the Four Seasons hotel, and **Weil** told agents that he had approximately 10 additional ounces of methamphetamine in the black bag in the trunk of his vehicle. Agents retrieved the methamphetamine from the black bag in the trunk of **Weil's** vehicle.

16. **Weil** told agents he had distributed as much as 150 pounds of methamphetamine which had all been supplied to **Weil** by a California-based drug trafficking organization (DTO). **Weil** told agents he currently owed the DTO for methamphetamine which had been supplied to **Weil** in the past on consignment. **Weil** identified **Daniel Hernandez** as a St. Louis area representative of the DTO who regularly collected payment from **Weil** for the methamphetamine. **Weil** said when he met **Hernandez** earlier in the day in the Home Depot parking lot, he paid **Hernandez** $8,000. **Weil** said during that meeting he told **Hernandez** that he (**Weil**) had an additional amount of money stashed at a third party residence. **Weil** told **Hernandez** he would retrieve the money later and meet with **Hernandez** to make an additional

drug payment. **Weil** provided agents with **Hernandez's** telephone number (314) 363-4536 (the **TARGET TELEPHONE**).

17. On July 16, 2013, agents met with **Weil** and recorded a telephone conversation between **Weil** and **Hernandez** which occurred over the **TARGET TELEPHONE**. At approximately 3:30pm, agents observed **Weil** dial the **TARGET TELEPHONE** number twice, but neither call was answered. At approximately 3:50pm, agents witnessed **Weil** receive and answer an incoming call from the **TARGET TELEPHONE**. The call was monitored and recorded by witnessing agents.

18. During the recorded call, **Weil** apologized for failing to meet with **Hernandez** the previous night to make the additional drug payment. **Weil** explained he had been unable to access the stashed money, but he would contact **Hernandez** in the near future in order to make the additional payment.

19. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular

telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

20. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the **TARGET TELEPHONE**, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available.

21. Based on my training and experience, I know that Sprint can collect cell-site data about the **TARGET TELEPHONE.**

## AUTHORIZATION REQUEST

22. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

23. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search

warrant does not authorize the seizure of any tangible property or any wire or electronic communication. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any electronic information (non-content) to obtain the authorized location information, there is reasonably necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2). This warrant does not authorize the interception or seizure of the content of any communications.

24. I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

25. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE** outside of daytime hours.

26. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jeremiah Henning
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on July 17, 2013.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **(314) 363-4536,** (the **"TARGET TELEPHONE"),** whose wireless service provider is Sprint, a company headquartered at 6550 Sprint Parkway, Overland Park, Kansas. The **TARGET TELEPHONE** is utilized by Daniel Hernandez, but the subscriber has not yet been identified.

2. Information about the location of the **TARGET TELEPHONE** that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

July 2013

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property or any wire or electronic communication. In approving this warrant, the Court finds reasonable necessity for the delay of notice. *See* 18 U.S.C. § 3103a(b)(2).

July 2013